No. 04-206

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 367

MINDY VAN VLEET, Individually and
as natural guardian of Vanesa Van Vleet,

       Petitioner and Appellant,

  v.

MONTANA ASSOCIATION OF COUNTIES
WORKERS' COMPENSATION TRUST,

       Respondent/Insurer and Respondent.


APPEAL FROM:    Workers' Compensation Court, State of Montana
                The Honorable Mike McCarter, Judge presiding.


COUNSEL OF RECORD:

       For Appellant:

              Anna M. Bidegaray, Daniel B. Bidegaray, Bidegaray Law Firm, Bozeman,
              Montana

       For Respondent:

              Norman H. Grosfield, Utick & Grosfield, Helena, Montana


                    Submitted on Briefs:  November 23, 2004

                           Decided:  December 21, 2004

Filed:

 

                                  Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1     Mindy Van Vleet (Van Vleet), individually and as natural guardian of Vanesa Van Vleet, appeals from the judgment entered by the Montana Workers' Compensation Court (WCC) on its order dismissing her petition requesting death benefits pursuant to the Montana Workers' Compensation Act for the death of Shawn Van Vleet (Shawn).  We reverse.

¶2     The issue on appeal is whether the WCC erred in determining that Shawn was not within the course and scope of his employment at the time of the fall which resulted in his death.

## BACKGROUND

¶3     At the time of his death, Shawn was employed as a deputy for the Phillips County Sheriff's Department (PCSD).  He fell from a hotel balcony while in Great Falls, Montana, for a Montana Narcotics Officers Association (MNOA) conference, sustaining injuries from which he eventually died.  Van Vleet is Shawn's widow and the mother of their child, Vanesa.  Van Vleet timely filed a workers' compensation claim with the PCSD's workers' compensation insurer, the Montana Association of Counties Workers' Compensation Trust (the Trust), requesting benefits as a result of Shawn's death.  The Trust denied Van Vleet's claim.

¶4     Van Vleet then petitioned the WCC for the death benefits and a determination that the Trust had unreasonably denied benefits for Shawn's death.  She also requested an award of costs, attorney's fees and a penalty against the Trust for its unreasonable actions.  The WCC held a hearing on Van Vleet's petition.  Based on the evidence presented at the hearing, the WCC subsequently entered findings of fact which set forth the following

2

circumstances surrounding Shawn's accident.

¶5   Shawn was employed as a deputy sheriff for the PCSD and assigned to work with the Tri-Agency Drug Task Force (Task Force). Shawn's direct supervisor in the Task Force was Mark Stolen (Stolen). On January 30, 2001, Shawn and Stolen traveled together to the Holiday Inn hotel in Great Falls, Montana, to attend a conference sponsored by the MNOA. Participants in the conference included law enforcement agents from around Montana, prosecutors and law enforcement equipment vendors. The conference afforded the participants an opportunity to attend courses relating to drug law enforcement and view products offered by the vendors. Shawn and Stolen arrived at the hotel and registered for the conference at approximately 5:00 p.m. on January 30, 2001.

¶6   After registering, Shawn and Stolen went to a hospitality room sponsored by the MNOA where the conference participants could network with each other and meet vendors of equipment they might purchase. Because the Task Force was contemplating the purchase of new equipment, Shawn's presence in the hospitality room to network and meet vendors was of benefit to the Task Force. Food and alcoholic beverages were available free of charge in the room. Stolen knew alcohol was available in the hospitality room and did not disapprove of Shawn and other agents drinking there, but did instruct them not to drink and drive. Sheriff Tom Miller, Shawn's supervisor at the PCSD, also was aware that conferences of this type often provided alcohol in hospitality rooms, but he did not prohibit drinking at the conferences.

¶7   The hospitality room closed sometime after midnight. At approximately 1:30 a.m., Shawn met up with four other individuals from the conference and they obtained a key to

the hospitality room. They went back into the room, where they consumed more alcohol and played "drinking games." The group left the hospitality room at approximately 2:00 a.m. Three of the individuals proceeded to a room on the fifth floor. Shawn and the fifth member of the group followed the first three to the room but were not allowed inside. Shawn's companion then entered his own room on the fifth floor, leaving Shawn alone in the hallway. One wall of the hallway was open, forming a balcony which overlooked an indoor courtyard. Shortly after Shawn was left alone in the hallway, he fell over a balcony railing on either the fourth or fifth floor to the main floor of the hotel, sustaining injuries from which he eventually died. Shawn had a blood alcohol level of .203 at the time of his death.

¶8     Based on the above findings of fact, the WCC concluded that Shawn's intoxication did not bar Van Vleet's claim, but Shawn was acting outside the course and scope of his employment at the time of his accident and, as a result, Van Vleet and her daughter were not entitled to workers' compensation death benefits. Consequently, the WCC dismissed Van Vleet's petition. Van Vleet appeals.

STANDARD OF REVIEW

¶9     Our review of a WCC decision is twofold. We review the court's findings of fact to determine whether they are supported by substantial credible evidence and its conclusions of law to determine whether they are correct. *Hiett v. Missoula County Public Schools*, 2003 MT 213, ¶ 15, 317 Mont. 95, ¶ 15, 75 P.3d 341, ¶ 15. Here, Van Vleet does not dispute any of the WCC's findings of fact. Consequently, we review only whether the court's interpretation of, and application of the facts to, the law is correct.

4

DISCUSSION

¶10    Whether the WCC erred in determining that Shawn was not within the course and

scope of his employment at the time of the fall which resulted in his death.

¶11    At the outset, we note the WCC correctly concluded that under § 39-71-407(4), MCA

(1999), Shawn's intoxication at the time of his fall did not bar Van Vleet's claim.  Although

this conclusion is not challenged in this appeal, we will first analyze the issue of Shawn's

intoxication during his conference participation as it is relevant to the argument later.

Section 39-71-407, MCA, states in pertinent part:

> (1) Each insurer is liable for the payment of compensation, in the manner and
> to the extent provided in this section, to an employee of an employer that it
> insures who receives an injury arising out of and in the course of employment
> or, in the case of death from the injury, to the  employee's beneficiaries, if
> any.
>
> . . . .
>
> (4) An employee is not eligible for benefits otherwise payable under this
> chapter if the employee's use of alcohol or drugs is not prescribed by a
> physician is the major contributing cause of the accident.  *However, if the*
> *employer had knowledge of and failed to attempt to stop the employee's use*
> *of alcohol or drugs, this subsection does not apply*. [Emphasis added.]

¶12    Here, Shawn's employers knew he was going to socialize and drink alcohol in the

MNOA sponsored hospitality room and did not prohibit him from doing so.  Shawn's

presence and socializing activities in the hospitality room was to network and meet vendors,

which was of benefit to PCSD.  The only limitation his supervisor or employer placed on

Shawn was not to drink and drive.  Shawn did not leave the conference site, but drank

alcohol in the hospitality room for approximately six hours with colleagues before it initially

closed, then continued drinking with colleagues in the same MNOA sponsored hospitality

room between 1:30 a.m. and 2:00 a.m.  Thus, the WCC correctly concluded that pursuant to § 39-71-407(4), MCA, Shawn's intoxication while at the conference cannot serve as a defense to exclude coverage for Van Vleet.  In fact, the WCC held:

> The evidence of deputy Van Vleet's direct supervisor shows his awareness of the claimant's drinking at the conference.  Indeed, drinking was condoned and widespread among conference attendees.  The situation in this case is no different than in *Thoreson v. Uninsured Employer's Fund*, 2000 MTWCC 40, wherein I held that the employer's knowledge of the claimant's marijuana use immediately preceding his injury precluded the drug and alcohol defense otherwise available under section 39-71-407(4), MCA.  I therefore conclude that the claim in this case is not barred under section 39-71-407(4), MCA, (1999).

¶13    We also note the WCC correctly concluded Shawn's attendance at the conference and his participation in the hospitality room was plainly within the course and scope of his employment pursuant to the four-factor test set forth in *Courser v. Darby School Dist. No. 1* (1984), 214 Mont. 13, 16, 692 P.2d 417, 419.  This conclusion is also not challenged on appeal and should be the point where this matter ended.  However, despite the legal and factual background which led the WCC to conclude Shawn was "attending to employment-related matters" for the first six hours of attendance in the hospitality room, the WCC then engaged in an unnecessary deviation analysis to seemingly create a defense where none existed.  This analysis resulted in the conclusion that Shawn's "drinking and late night activities took him outside the course and scope of his convention attendance" and at the time of his fall, Shawn had substantially deviated from his employment.

¶14    Despite its conclusion that Shawn's attendance, drinking and intoxication while at the conference sponsored hospitality room did not bar Van Vleet's claim, the WCC, analyzing under *Dale v. Trade Street, Inc.* (1993), 258 Mont. 349, 854 P.2d 828, concluded that death

6

benefits were precluded pursuant to § 39-71-407(1), MCA (1999).  In *Dale*, we held an employee's injuries are compensable when the employee is "attending to employment-related matters" when injured.  *Dale*, 258 Mont. at 355, 854 P.2d at 832.  We also commented "[i]t is well established in Montana that traveling employees are not covered 24 hours a day, without limitation, regardless of the conduct or activity in which they are involved. . . . The employee must remain in the course and scope of employment while traveling for the injury to be compensable."  *Dale*, 258 Mont. at 352-53, 854 P.2d at 830.

¶15     Here, the WCC first noted that *Dale* reaffirmed this Court's refusal to overrule precedents holding an employee under the influence of alcohol who is nonetheless in the course and scope of his employment is entitled to compensation and that the ultimate test is not whether the claimant is under the influence of alcohol, but whether he was "attending to employment related matters."  *Dale*, 258 Mont. at 355, 854 P.2d at 831.  Then, conflicting with its earlier conclusion that Shawn's hospitality room activities were within the course and scope of his employment, and while there he was attending to employment related matters, the WCC drew a distinction between the earlier six hours of socializing and drinking and the later half-hour of drinking.  The WCC noted:

> [Shawn] was not in the course and scope of his employment when he fell to his death, therefore his widow and other potential beneficiaries are not entitled to death benefits.  After the initial closure of the hospitality room, [Shawn] was no longer 'attending to employment related matters.'  At that point, it was clearly bedtime for all but [Shawn] and four others who chose to continue drinking.  They reopened the hospitality room not for business related to their employment but to drink some more and play drinking games.  The tragedy followed on the heels of more drinking.

The WCC's magic termination point of "employment related matters" was the initial closing of the hospitality room doors.  We cannot draw such a distinction.

7

¶16 On appeal, the Trust mirrors the WCC's conclusion and maintains Shawn substantially deviated from the course and scope of his employment when he reentered the hospitality room and continued to drink alcoholic beverages, and at that point, Shawn abandoned any business purpose as the after hours drinking provided no benefit to the employer. The Trust asserts "[i]t is not reasonable to find compensability based upon the assumption an employer might directly or indirectly approve of excessive drinking and subsequent drinking games (at a closed hospitality room) which resulted in a blood alcohol level of .203." Van Vleet challenges this conclusion, arguing that because Shawn was at the conference for the benefit of his employer, his attendance at the conference and the hospitality room were within the course and scope of his employment and he remained within the course and scope of his employment through the time he fell. We agree with Van Vleet.

¶17 At this point, it is important to note what is not in dispute in this case, both factually and legally. There is no dispute that Shawn's attendance at the MNOA conference was work related and within the course and scope of his employment. There is further no dispute that Shawn's attendance in the hospitality room and his consumption of alcohol up until the time it initially closed was approved by his employer and within the course and scope of employment related matters. During this period of work related activity, Shawn consumed alcoholic beverages over a period of approximately six hours. Not surprisingly, evidence disclosed Shawn had a blood alcohol level of .203 at the time of his death. The first six hours of drinking surely contributed to his extreme intoxication. Obviously, the WCC was influenced by the fact that additional drinking took place after the hospitality room closed.

8

Implicit in the WCC's finding is a determination that somehow the additional half-hour of drinking was the real cause of Shawn's death. There is absolutely no evidence to support a conclusion that Shawn was not legally intoxicated when he initially left the hospitality room; nor is there any evidence in the record that Shawn was initially sober when he initially left the hospitality room and the additional half-hour of drinking was the cause of the intoxication. To the contrary, the evidence is compelling that Shawn was already intoxicated when the hospitality room initially closed its doors. Had Shawn fallen off the balcony at that point, under the WCC's analysis, Van Vleet would be compensated.

¶18    It must be remembered that the issue is not Shawn's drinking and intoxication. The WCC concluded, and the parties agree, Shawn's intoxication during the conference did not bar Van Vleet's claim. The pivotal question under these facts, according to the WCC, is whether Shawn's later half-hour of drinking, up until the time of his fall, constituted a substantial deviation from his earlier six hours of drinking, which was established as "employment related matters."

¶19    *Gordon v. H.C. Smith Construction* (1980), 188 Mont. 166, 612 P.2d 668, is a similar case where a Butte electrician, while on a job site in Denton, met up with some fellow electricians at the local bar where they drank alcohol and played pool for approximately four hours. Gordon was killed when he and his colleagues left the bar and his colleague, who was driving, went off the road. This Court commented that "it cannot come as a great shock to the employer or be unforeseeable by the insurer that working men away from their homes and families may visit a saloon for a beer after work." *Gordon*, 188 Mont. at 174, 612 P.2d at 672. Similarly, here, it is not shocking, nor is it unforeseeable that Shawn and his

9

colleagues, while away from their homes and families, would attend and participate in a conference sponsored hospitality room where alcohol was provided in order to socialize and network.

¶20 The insurer in *Gordon* argued that Gordon had deviated from his employment when stopping at the Denton bar. This Court noted that "Workers' compensation legislation is the original no fault insurance. If an employee performs his job negligently and is killed as a result, his death is compensable." *Gordon*, 188 Mont. at 174, 612 P.2d at 672. The insurer, by arguing Gordon had deviated from his employment, attempted to interject fault into a no fault system. *Gordon*, 188 Mont. at 174, 612 P.2d at 672. Additionally, this Court held Gordon's death occurred during the course of his employment as our case law demonstrates that a claimant's intoxication, does not by itself, establish a deviation from the course of employment. *Gordon*, 188 Mont. at 174, 612 P.2d at 672.

¶21 Here, the WCC, through its deviation analysis, has interjected fault into a no fault system. This was not a situation where Shawn left the premises or participated in some peculiar after hours activity at the Holiday Inn not anticipated by his employer. Additionally, Shawn's employer was well aware that drinking alcohol would be a part of the conference and conceded that Shawn's presence at the hospitality room and his attendance at the conference was of benefit to the PCSD. Shawn's intoxication, does not by itself, establish a deviation from the course of employment. Under the WCC's analysis, after the hospitality room closed, the only choice for attendees of the conference was to go to bed because any compensable claims ended when the doors closed.

¶22 The burden of proving an employee deviated from the course and scope of his

10

employment is on the employer or workers' compensation insurer. *See Gordon*, 188 Mont. at 173, 612 P.2d at 672 (citations omitted). There is no evidence in the record that supports a legal holding that it was bed time for attendees or that drinking alcohol after a set time was prohibited. Thus, under these facts, any drinking that occurred in the hospitality room with colleagues that night is not a deviation from the course and scope of Shawn's employment.

¶23 Here, Shawn and his companions simply continued on with the same sponsored activity, including when they returned to the hospitality room and up until the time of Shawn's fall. The drinking that occurred was the continuation of the same activity, in the same way, in the same place, for the same purposes and with the same sanctions of the employer that mandates the conclusion Shawn began the night in the course and scope of his employment and remained there until his fall. It was certainly foreseeable to Shawn's employer that drinking would not only occur in the hospitality room, but at other times during this conference.

¶24 As we stated earlier, because Shawn did not deviate from the course and scope of employment, there is no need to analyze the case under *Dale* as the WCC did. Van Vleet correctly argues that if Shawn's intoxication cannot be used as a defense to compensability, then it is inconsistent and legally incorrect for the WCC to have based its later conclusion regarding course and scope of employment on that same intoxication. As such, we hold the WCC erred when interpreting and applying the four factors from *Dale* to determine whether Shawn deviated from his traveling employee status.

¶25 We hold that the WCC incorrectly determined Shawn was not within the course and scope of his employment at the time of the fall which resulted in his death and erred in

11

dismissing Van Vleet's petition on that basis. Reversed and remanded to the WCC to enter judgment and an award of benefits to Van Vleet on her behalf and on behalf of Vanesa, their daughter.

/S/ JIM REGNIER

We Concur:

/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART

12

Chief Justice Karla M. Gray, dissenting.

¶26 I respectfully dissent from the Court's conclusion that Shawn Van Vleet was within the course and scope of his employment at the time of the fall which resulted in his death. It is my opinion that Shawn's early morning activities constituted a deviation from work-related matters, putting him outside the course and scope of his employment at the time he fell from the balcony. I would affirm the WCC's dismissal of Van Vleet's petition for workers' compensation benefits on that basis.

¶27 At the outset, I agree the WCC correctly determined that Shawn's extreme intoxication at the time he fell does not bar Van Vleet's petition under § 39-71-407(4), MCA. I further agree that, pursuant to the four-part test set forth in Courser v. Darby School Dist. No. 1 (1984), 214 Mont. 13, 692 P.2d 417, the WCC correctly determined that Shawn's presence at the MNOA conference and participation in the hospitality room prior to its closing at midnight were within the course and scope of his employment.

¶28 I strenuously disagree, however, with the Court's statements that the WCC's determination regarding the course and scope of Shawn's employment resolved the issue before it and that the WCC's further analysis of whether Shawn deviated from the course and scope of his employment was unnecessary. The Trust argued in the WCC that workers' compensation benefits were not payable because Shawn had deviated from the course and scope of his employment at the time he fell and it was necessary for the WCC to address this argument. Moreover, in my opinion, the WCC correctly determined that Shawn had deviated from the course and scope of his employment at the time he fell from the balcony.

13

¶29　Section 39-71-407(1), MCA, provides that an insurer is liable for the payment of workers' compensation benefits to an employee or the employee's beneficiary if the employee "receives an injury arising out of and in the course of employment . . . ." Generally, when an employee is traveling for the purpose of performing an assignment incidental to the employee's regular employment and of some immediate benefit to the employer, an injury sustained by the employee during that travel may be deemed to have occurred in the course and scope of employment. See Courser, 214 Mont. at 16, 692 P.2d at 418-19 (citation omitted). In Courser, we set forth four factors applicable in determining whether travel activity during which an injury occurs is work-related and, thus, within the course and scope of the employment: (1) whether the activity was undertaken at the employer's request; (2) whether the employer directly or indirectly compelled the employee's attendance at the activity; (3) whether the employer controlled or participated in the activity; and (4) whether both the employer and employee mutually benefitted from the activity. Courser, 214 Mont. at 16, 692 P.2d at 419.

¶30　The parties do not dispute that the WCC correctly applied the four Courser factors to its initial determination that Shawn's attendance at the conference and participation in the hospitality room until its closure by the sponsor at midnight was within the course and scope of his employment. However, as the Court correctly observes, traveling employees are not covered 24 hours a day without limitation. The employee must remain within the course and scope of employment during travel in order for an injury to be compensable. Dale v. Trade Street, Inc. (1993), 258 Mont. 349, 352-53, 854 P.2d 828, 830.

14

¶31    Based on these principles, we have developed what is termed the "deviation" rule which provides that, if the employee departs from the mutually beneficial purpose of the travel--that is, temporarily leaves the employment and does not attend to employment-related matters--the employment connection is severed and an injury sustained during the period of the deviation is outside the course and scope of employment. Dale, 258 Mont. at 355-56, 854 P.2d at 832. Furthermore, the question of whether an employee deviated by no longer attending to employment-related matters also is resolved by applying the four-part Courser test. Dale, 258 Mont. at 355-56, 854 P.2d at 831-32. In other words, the Courser factors are used to determine both whether overall travel is within the course and scope of employment and whether a deviation from compensable travel renders an employee outside the course and scope of the employment.

¶32    Here, the WCC applied the four Courser factors and determined that Shawn's attendance at the conference and participation in the hospitality room prior to its closing at midnight were within the course and scope of his employment. In that regard, the WCC found that Shawn's attendance at the conference was at least encouraged, if not required, by his employer and that his immediate supervisor attended the conference and participated in the hospitality room with him. The WCC further found that Shawn's attendance at the conference and hospitality room were of benefit both to himself and his employer because Shawn was to attend training courses, could network with other law enforcement officers and prosecutors, and could meet with equipment vendors to evaluate available products which the Task Force was contemplating purchasing. Thus, Shawn's participation in the MNOA-

15

sponsored hospitality room until its closure was within the course and scope of his employment under the Courser test.

¶33 The problem with the Court's analysis of this case is that, having observed that we apply the four-part Courser test to determine whether an employee's activities are within the course and scope of employment and that a traveling employee is not covered 24 hours a day without limitation, the Court never returns to or applies these legal concepts. The Court merely concludes that

> Shawn and his companions simply continued on with the same sponsored activity, including when they returned to the hospitality room and up until the time of Shawn's fall. The drinking that occurred was the continuation of the same activity, in the same way, in the same place, for the same purposes and with the same sanctions of the employer that mandates the conclusion Shawn began the night in the course and scope of his employment and remained there until his fall.

Simply put, this conclusion is both factually and legally incorrect. Moreover, and at best, the Court's conclusion leaves the "not covered 24 hours a day" principle on shaky ground indeed.

¶34 The MNOA-sponsored hospitality room closed at midnight. There is no evidence that the MNOA or Shawn's employer authorized or condoned use of the room after midnight. Consequently, the presence of Shawn and his companions in the room after obtaining a key from a hotel employee was not a "sponsored activity." Moreover, Shawn's early-morning activities were not a continuation of the same earlier activity and were not conducted for the same purposes. Rather, viewing the facts of this case in light of the four Courser factors reveals that Shawn's early-morning activities were a deviation from, and not within, the course and scope of his employment.

16

¶35	Shawn's employer and supervisor did not encourage him, and did not accompany him, in his early-morning activities including personal use of the hospitality room after its sponsor closed it. Nor was there any benefit to his employer in the additional socializing in which Shawn and others participated after obtaining a key to the room from a hotel employee. Shawn was not attending training courses, there no longer were equipment vendors in the hospitality room and, other than Shawn's four drinking companions, there were no law enforcement officers or prosecutors with which to network for employment purposes. No evidence suggests--much less establishes--that Shawn and his companions were doing other than personal, nonwork-related socializing. Once the MNOA closed the sponsored hospitality room, the Courser factors no longer were met. I would conclude, therefore, that Shawn's early-morning activities after the hospitality room closed were not work-related and constituted a deviation from the course and scope of his employment.

¶36	Furthermore, the Court's reliance on Gordon v. H.C. Smith Const. Co. (1980), 188 Mont. 166, 612 P.2d 668, is misplaced as that case is readily distinguishable. In that case, we concluded that Gordon was on his way to where he was staying for the night at the time the accident occurred. Consequently, he was within the course and scope of his employment as a traveling employee because he was en route from work. Gordon, 188 Mont. at 173-74, 612 P.2d at 672. Thus, the question of whether Gordon's stop at a bar to drink and socialize constituted a deviation from work-related matters was of no import because Gordon subsequently proceeded on his way home from his job, which activity was work-related. Gordon, 188 Mont. at 174-75, 612 P.2d at 672-73. In contrast, there is no evidence here that Shawn had discontinued his early-morning activities and was proceeding to his room for the

17

night at the time he fell from the balcony. Indeed, Shawn's last known activity was trying unsuccessfully to continue with more drinking. There is no record basis for the Court's determination that the facts of this case are similar to those in Gordon.

¶37    More importantly, however, the Court hangs it hat on Gordon in the context of its continued refusal to accept the reality that the sponsored hospitality room--conceded by all to be within the course and scope of Shawn's employment--had closed before the activities at issue here began. The Court's statement, vis-a-vis Gordon, that "[s]imilarly, here, it is not shocking, nor is it unforeseeable that Shawn and his colleagues, while away from their homes and families, would attend and participate in a conference sponsored hospitality room where alcohol was provided in order to socialize and network," simply and totally ignores the actual facts of this case, which include not only additional drinking, but drinking games after the hospitality room was closed.

¶38    Finally, I disagree that the WCC based its conclusion that Shawn was not within the course and scope of his employment when he fell on the fact that Shawn was highly intoxicated at the time. Rather, the WCC concluded that Shawn was not "attending to employment-related matters." While Shawn's presence in the hospitality room and his drinking while there prior to its closing was condoned by and beneficial to his employer, his subsequent activities were not. It is not the fact of his intoxication which removed him from the course and scope of his employment. Shawn's early-morning activities after the sponsor closed the hospitality room, which were devoid of any benefit to his employer, constituted the deviation.

18

¶39    In my view, the WCC correctly determined Shawn was not within the course and scope of his employment at the time he fell from the balcony.  Consequently, I would affirm the WCC's dismissal of Van Vleet's petition for workers' compensation benefits and I dissent from the Court's failure to do so.

/S/ KARLA M. GRAY


Justice James C. Nelson and Justice Jim Rice join in the foregoing dissenting opinion.


/S/ JAMES C. NELSON
/S/ JIM RICE