DA 08-0285

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 149

MARTIN HETH, JR.,

        Petitioner and Appellee,

v.

MONTANA STATE FUND,

        Respondent and Appellant.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2006-1758
Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Kelly M. Wills, Elizabeth D. Lowrance, Garlington, Lohn & Robinson, PLLP, Missoula, Montana

        For Appellee:

            Patrick R. Sheehy, Halverson, Sheehy & Plath, P.C., Billings, Montana

                Submitted on Briefs:  March 25, 2009

                      Decided:  May 5, 2009

Filed:

            _____
                          Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Martin Heth, Jr., known by the initials "JR," worked for his father, Martin Robert "Bob" Heth (Heth). In September 2005, JR was seriously injured in a one-vehicle automobile accident. His stepmother, who also worked for the family company, was killed in the accident. At the time of the accident, JR was driving the septic tank pumping truck owned by his father's plumbing company and was leaving a completed pumping job. He was also intoxicated. JR filed a claim for workers' compensation benefits. The Montana State Fund (State Fund or the Fund) denied the claim on the ground that JR's intoxication precluded payment of benefits. JR filed a petition with the Workers' Compensation Court (WCC). The WCC, interpreting the "employer knowledge" exception of § 39-71-407(4), MCA (2005)[1], in the Workers' Compensation Act (WCA), ruled that the Fund was liable for JR's claim. State Fund appeals. We affirm.

**ISSUES**

¶2 A restatement of the issues on appeal is:

¶3 Did the WCC incorrectly interpret and apply § 39-71-407(4), MCA, to the case before us?

---

[1] A workers' compensation benefits claim is governed by the provisions of the WCA in effect at the time of the accident; in this case, 2005. *Buckman v. Montana Deaconess Hosp.*, 224 Mont. 318, 321, 730 P.2d 380, 382 (1986). All references to the WCA in this Opinion will be to the 2005 version.

2

¶4 Were the WCC's findings of fact pertaining to Heth's knowledge that his son consumed alcohol while performing his employment duties supported by substantial credible evidence?

¶5 Were the WCC's findings of fact regarding Heth's credibility inconsistent?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Heth began working in the plumbing industry in 1959 when he was eighteen years old. In 1983, JR, then thirteen, moved in with Heth and Heth's wife, Emily,[2] and in 1986, at age sixteen, JR joined his father in the plumbing business. In 1994, Heth moved with Emily and JR to Hardin, Montana, and started Bob's Plumbing and Heating. As a sole proprietor, Heth obtained workers' compensation insurance from the Montana State Fund. JR immediately began working for Bob's Plumbing, installing and pumping septic tanks. Subsequently, Heth started a related business, A-1 Septic. A-1 Septic leased out portable toilets. JR worked for A-1 Septic as well.

¶7 At some time during their lengthy working relationship, JR began drinking beer in the company truck while working. After Heth noticed the empty beer cans in the truck, he confronted his son. He did not forbid his son from drinking during work; rather, he instructed him to "modulate" and "control" the amount he drank while working. He also told JR to keep the empty cans out of view by putting them in a bag to be kept behind the truck seat, and to bring them home for recycling. Heth testified that he did not want his

---

[2] JR lived with Heth and Emily continuously from 1983 until the accident in 2005. When not hospitalized, JR continues to live with his father.

son to be drunk, to drive while intoxicated, or to smell of alcohol when meeting with customers.

¶8  The day before JR's accident, JR and Heth traveled in separate trucks to the Missouri Breaks area to retrieve multiple portable toilets A-1 Septic had leased to the Bureau of Land Management and the U.S. Forest Service for use by firefighters. It took Heth and JR approximately sixteen hours to travel from Hardin to the worksite, pick up the toilets and proceed to Malta where they intended to spend the night, before returning to Hardin the following day. Upon arrival in Malta around 10 p.m., however, JR announced that he was returning to Hardin that night. His father attempted to dissuade him but JR was adamant. After taking a six-pack of beer he had put in his father's truck, JR left for Hardin in the truck pulling the trailer carrying the portable toilets. Heth said he did not try to stop JR from taking the beer because "it wouldn't do any good." Because JR was pulling a loaded trailer, Heth speculated that it took him approximately five hours to travel the 250 miles from Malta to Hardin, and that he probably arrived home between 2 and 3 a.m.

¶9  The following morning, September 17, 2005, Heth left for Hardin, making a few stops along the way. He arrived home at approximately 3 p.m. His cell phone had not been working so he did not speak to his son or his wife that day. When he arrived, he found a note that Emily had written at approximately 10:30 a.m. indicating that she and JR had gone to pump a septic tank.

¶10  Meanwhile, at approximately 1:50 p.m., JR, while driving the loaded septic tank pump trunk, ran off the road, over-corrected, and lost control of the truck. The truck

4

went over an embankment and rolled. Emily was ejected from the truck and died at the scene of the accident. JR was seriously injured and was transported by ambulance to Big Horn County Memorial Hospital where, at approximately 3:22 p.m., medical personnel took a routine hospital admission blood sample. This test revealed, among other things, that JR had a blood alcohol level (BAC) of .0874. The Montana Highway Patrol officer who was dispatched to the accident scene and followed JR's ambulance to the hospital requested that Big Horn medical personnel take a second blood sample to be analyzed by the State Forensic Lab. The officer had seen evidence of alcohol consumption at the scene and had smelled alcohol on JR. This sample was drawn at approximately 3:35 p.m. and later indicated a BAC of .06.

¶11    JR was subsequently flown by helicopter to St. Vincent Hospital in Billings. An admission blood sample taken at 5:05 p.m. revealed a BAC of .041. JR was evaluated by various doctors upon admission, one of whom ordered the initiation of alcohol withdrawal protocol within twenty-four hours of JR's arrival.

¶12    JR remained in a coma at St. Vincent's Hospital for several weeks. After regaining consciousness and undergoing rehabilitation therapy, JR was released to his father's care. JR is permanently and totally disabled and has no recall of the accident or the events leading to it.

¶13    Heth, on behalf of his son, filed a claim for workers' compensation benefits. Relying on § 39-71-407(4), MCA, the State Fund denied his claim on the ground that JR was intoxicated at the time of the accident. In November 2006, JR, through counsel, filed a petition for a hearing before the WCC. JR argued that § 39-71-407(4), MCA, allows an

5

intoxicated employee who is injured while working to receive benefits if his employer "had knowledge of and failed to attempt to stop the employee's use of alcohol."

¶14 After mediation failed, the WCC scheduled a hearing which was conducted on February 7 and February 11, 2008. The court issued its Findings of Fact, Conclusions of Law and Judgment on April 25, 2008, holding State Fund liable for JR's claim. State Fund filed a timely appeal.

## STANDARD OF REVIEW

¶15 We review the WCC's findings of fact to determine whether they are supported by substantial credible evidence. "Substantial credible evidence" is that which a reasonable mind could accept as adequate to support a conclusion. *Harrison v. Liberty Northwest Ins. Corp.*, 2008 MT 102, ¶ 11, 342 Mont. 326, 181 P.3d 590. We review the WCC's conclusions of law for correctness. *Harrison*, ¶ 11.

## DISCUSSION

¶16 *Did the WCC incorrectly interpret and apply § 39-71-407(4), MCA, to the case before us?*

¶17 As indicated above, JR argued before the WCC that while § 39-71-407(4), MCA, generally precluded paying benefits to a claimant who was intoxicated at the time of his or her accident, it provided an exception to that preclusion—the "employer knowledge" exception. Section 39-71-407(4), MCA, provides "[a]n employee is not eligible for benefits otherwise payable under this chapter if the employee's use of alcohol or drugs not prescribed by a physician is the major contributing cause of the accident. *However, if the employer had knowledge of and failed to attempt to stop the employee's use of alcohol*

6

*or drugs, this subsection does not apply.*" (Emphasis added.) JR maintained that his father knew he drank while working and never tried to stop his alcohol use. Rather, his father asked only that he "modulate" his drinking. Heth explained at the hearing that "modulation" meant consuming a six-pack over a period of time, instead of doing so all at once. JR argued that such a caution did not satisfy the statute's requirement that his employer "attempt to stop" his use of alcohol while working.

¶18 State Fund argued to the WCC that under § 39-71-407(4), MCA, it was not liable for benefits to JR because alcohol consumption was the "major contributing cause" of his accident. It relied on the multiple blood tests taken between approximately 3:20 p.m. and 5:05 p.m. on the day of the accident to support its claim. It further maintained that the septic tank pump truck JR was driving was a commercial vehicle, and the legal blood alcohol content limit for drivers of commercial vehicles in 2005 was less than .04. State Fund pointed out that JR's BAC was above .04 in all three blood tests.

¶19 The Fund also argued that JR's reliance on the "employer knowledge" exception was misplaced. State Fund asserted that for this exception to be available, an employer must have had "specific knowledge" of the employee's use of alcohol at the time of the accident **and** fail to attempt to stop the employee's use of alcohol. The Fund maintained that Heth had not seen nor spoken to his son on the day of the accident, and therefore he had no specific knowledge that JR was drinking that day. This being so, Heth could not take action to prevent his alcohol use just prior to the accident.

¶20 The WCC heard extensive testimony from two accident reconstruction experts. One expert, Dr. Lee, excluded environmental factors, such as rain, fog, poor road

7

conditions, and vehicle failure, among others, from being the cause of the accident. He ultimately concluded that "driver error" was the cause.

¶21   The other expert, Dr. Gill, reconstructed the accident by looking at human factors, specifically driver fatigue and intoxication. Despite the long work day JR had experienced the day before the accident, Dr. Gill concluded that driver fatigue was not a logical explanation. He based this on various factors: (1) time of day of the accident—midday being a person's peak level of alertness; (2) the presumed length of time JR had slept the night before—arriving home at 2 a.m. and leaving for work at 10:30 a.m.; and (3) the length of time JR had been driving before the accident—approximately one hour. Concluding that the evidence did not support fatigue as a cause for the accident, Dr. Gill stated it was even less likely that JR fell asleep at the wheel. He explained that JR's response time to running off the road did not support a conclusion that he had fallen asleep. Dr. Gill concluded that JR's BAC at the time of the accident, based on his BAC hours after the accident, was between .10 and .11, and was the cause of JR's accident.

¶22   Heth also testified at the hearing, explaining that he wanted JR to take over the physically-demanding part of the business by the end of 2005 so that Heth could concentrate on the less strenuous paperwork side of the business. Heth said he was concerned that his relationship with JR would be damaged if he forbade JR from drinking while working, and therefore he counseled control and modulation instead. He stated that he saw JR both at home and at work almost every day and had never seen him drink to excess while working, drive while impaired, or drink more than one or two beers while on the job.

8

¶23　On cross-examination, Heth admitted that he understood the "employer knowledge" exception to the WCA, and that if he testified that he knew JR was drinking while working that JR may qualify for benefits. He also acknowledged that if State Fund paid JR benefits, JR's care, both before and after Heth was no longer able to care for him, would be better.

¶24　The WCC expressly found Heth, Dr. Lee and Dr. Gill to be credible witnesses. As a result of witness testimony and the report prepared by the officers who were dispatched to the accident scene, the WCC concluded that JR's use of alcohol was the major contributing cause of the accident. The court declined to rule on whether the septic tank pump truck was a commercial vehicle. It noted that a BAC level of .0874 was beyond the legal limit for both commercial and non-commercial vehicles, and therefore the classification of the vehicle was irrelevant. The WCC concluded that the plain language of the "employer knowledge" exception did not require the employer to have "specific knowledge" of alcohol or drug use just prior to the accident. The court explained:

> The facts of this case are not such that the employer discovered his employee drinking on the job on one isolated incident prior to the injury. This is a situation where [JR's] employer knew that he drank alcohol on the job on a regular, recurrent basis. I do not believe the statutory language means that an employer can be aware of and condone regular drinking on the job, yet can escape liability under the statute provided the employer did not witness the employee's drinking immediately before the accident. . . . Although Heth may have attempted to get [JR] to moderate his on-the-job consumption of alcohol and to spread his drinks out throughout the day, Heth made no attempt to actually **stop** [JR's] use of alcohol on the job. Therefore, I conclude that since Heth knew of his employee's use of alcohol and failed to attempt to stop it, the bar of eligibility for benefits found in § 39-71-407(4), MCA, does not apply in the present case.

9

¶25 On appeal, State Fund asserts that the WCC incorrectly interpreted § 39-71-407(4), MCA, and maintains that the "employer knowledge" exception is not available to JR. It submits the following interpretive errors: (1) the employer must have specific knowledge of an employee's alcohol or drug use contemporaneous with the accident; (2) the employer must have the opportunity to stop the employee's alcohol or drug use at the time of the accident; and (3) the employer's knowledge of the employee's "isolated and responsible use of alcohol (or drugs) does not invoke the exception." The Fund opines that the legislative revisions to this statute between 1987 and 1995, adding reference to alcohol and drug use and creating the "employer knowledge" exception, support its conclusion that the employer must have contemporaneous knowledge of alcohol consumption. It submits that the WCC's interpretation renders an employer absolutely liable if it "has *general* knowledge that an employee has consumed alcohol while working and ***fails*** *to take steps to stop the employee from ever again consuming alcohol on the job.*" (Emphasis in original.) The Fund further asserts that contemporaneous knowledge by employers of their employee's alcohol and drug use just prior to their respective accidents was "significant" to this Court in *Van Vleet v. Ass'n of Counties Work. Comp.*, 2004 MT 367, 324 Mont. 517, 103 P.3d 544, and *Thoreson v. Uninsured Employer's Fund*, 2000 MTWCC 40, *aff'd, Thoreson v. Uninsured Employers' Fund*, 2002 MT 6N, 309 Mont. 529, 43 P.3d 983.

¶26 JR counters that a plain reading of § 39-71-407(4), MCA, reveals no "contemporaneous employer knowledge" requirement. He states that the WCC interpreted the statute based upon its plain language and correctly declined to insert what

had been omitted. Section 1-2-101, MCA. JR further submits that examining the legislative intent of a statute need be done only when the statute is ambiguous and this statute is not ambiguous. Furthermore, he claims that the State Fund's argument vis-à-vis the legislative intent is weak in that it quotes a letter from a proponent to the 1987 legislative change, rather than the Legislature itself. JR also challenges the significance attributed to the employers' contemporaneous knowledge in *Van Vleet* and *Thoreson*. He notes that while such knowledge was a fact in those cases, our rulings did not turn on this fact.

¶27 The plain language of § 39-71-407(4), MCA, does not require that an employer have knowledge of alcohol and/or drug use immediately prior to his or her employee's accident. We have repeatedly acknowledged that it is not our prerogative to alter a statute that the Legislature has enacted. Section 1-2-101, MCA ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted."); *Citizens Right to Recall v. McGrath*, 2006 MT 192, ¶ 18, 333 Mont. 153, 142 P.3d 764. If the Legislature intended the statute to be interpreted as propounded by State Fund, it could have expressly and unequivocally included a "contemporaneous" requirement. It did not do so, nor will we.

¶28 We note, as shown in *Van Vleet* and *Thoreson*, that an employer may have contemporaneous knowledge of an employee's alcohol or drug use just prior to the employee's accident and that such knowledge triggers a determination of whether the "employer knowledge" exception applies. However, these cases did not grant the

11

employee benefits based on his employer's contemporaneous knowledge; rather, *Van Vleet* turned on whether the employee's intoxication took him outside the scope of his employment, and *Thoreson* was decided based on what the employer did with the knowledge of his employee's drug use just before his accident. Therefore, our rulings in *Van Vleet* and *Thoreson*, where contemporaneous knowledge existed, do not preclude a different ruling under different facts.

¶29     As the evidence indicates in the case before us, Heth had ongoing knowledge that JR drank beer while working and driving the company trucks. He had discussed it with JR on more than one occasion and had observed both full and empty beer cans in the trucks. As noted by the WCC, this was not a case where an employer caught an employee on an isolated occasion drinking on the job just prior to an accident. Not only did Heth have knowledge that JR drank on the job, he did not attempt to stop him, as required by the plain language of the statute; rather, he acquiesced, merely counseling moderation and control.

¶30     In an effort to highlight the asserted absurdity of the WCC's interpretation, the State Fund presents numerous hypothetical situations involving an employer's knowledge of alcohol or drug use that is not contemporaneous with the employee's accident or injury. We will not address these hypothetical scenarios as they do not reflect the facts before us. Moreover, we will not insert language into the statute that imposes a temporal component upon an employer's knowledge. In any event, we think it unlikely that the Legislature intended to allow an employer to be aware of and condone drinking on the job and then allow that employer to escape liability because he or she did not witness the

12

alcohol or drug consumption immediately prior to the employee's accident. Under these circumstances, we conclude the WCC did not incorrectly interpret and apply § 39-71-407(4), MCA, to the facts of this case.

¶31    *Were the WCC's findings of fact pertaining to Heth's knowledge that his son consumed alcohol while performing his employment duties supported by substantial credible evidence?*

¶32    State Fund asserts that the WCC's factual findings pertaining to Heth's knowledge of his son's alcohol consumption while working were not supported by substantial credible evidence. The Fund maintains that the WCC selectively quoted from Heth's testimony but omitted statements that would, or should, have led the WCC to a different conclusion. Specifically, the Fund claims that the "undisputed evidence proved that Heth cautioned his son to drink responsibly, understood that JR would never have more than a beer or two, never saw JR drunk at work, and never knew his son to drive when he was impaired from alcohol." State Fund also challenges the WCC's conclusion that JR's consumption of alcohol on the job was a "regular" and "recurrent" event and that Heth was "aware of and condone[d] regular drinking on the job."

¶33    Our review of the trial transcripts and Heth's deposition transcript indicate that substantial credible evidence existed to support the WCC's findings. Contrary to the Fund's claims, the WCC did not state nor imply in its findings that JR drank a six-pack of beer during a single work shift. The court fairly summarized Heth's testimony, including that in which Heth stated that he had never seen JR drunk while working or driving. Furthermore, State Fund's argument notwithstanding, it was apparent from the evidence that Heth was "aware of and condone[d]" JR's drinking on the job.

13

¶34 State Fund's dispute appears to arise from the WCC's use of the word "regular" when describing JR's drinking on the job. The Fund claims that Heth acknowledged only a single incident of finding beer cans in the truck followed by a conversation about drinking responsibly. However, there are multiple references in the record where Heth admitted knowing that JR drank while working. Moreover, Heth's knowledge of JR's drinking was further established when Heth testified that he expected JR to drink the six-pack of beer he took when leaving Malta the night before his accident, while driving home. Heth also specifically discussed at least two conversations he had with JR about drinking while working—one about drinking in front of the customers and disposing of the empty beer cans in the truck, and a subsequent conversation after the "open container" law was passed.

¶35 As explained above, "substantial credible evidence" is evidence which a reasonable mind could accept as adequate to support a conclusion. *Harrison*, ¶ 11. The evidence presented to the WCC supported the court's factual findings, including its finding that JR's drinking while working was "regular" or "recurrent."

¶36 *Were the WCC's findings of fact regarding Heth's credibility inconsistent?*

¶37 Finally, State Fund criticizes the WCC's findings regarding Heth's credibility as "inconsistent." The Fund claims that the WCC found Heth credible despite Heth's acknowledgment that he understood that if he testified that JR drank with his knowledge, JR might receive benefits, yet found Heth incredible in his portrayal of the amount of alcohol JR consumed. The WCC specifically stated, "I find Heth's testimony about his knowledge of [JR's] drinking on the job to be credible. While he testified that he knew

[JR] drank beer while working, Heth also attempted to portray his son's drinking as a few beers spaced out throughout the day in response to Heth's urging that [JR] 'modulate' his drinking while working." This statement does not present any error. It is the function of the WCC as finder of fact to discount or grant greater weight to testimony based on the credibility of the witness. We defer to the WCC's findings of credibility, as it had the opportunity to assess and observe a witness's demeanor and presentation of evidence. *Harrison*, ¶ 12.

## CONCLUSION

¶38    For the foregoing reasons, we affirm the WCC's Findings of Fact, Conclusions of Law and Judgment.


/S/ PATRICIA COTTER


We concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JOHN WARNER